*McHenry & Hill, for appellant.*

---

A. R. MULLINS, ET AL. v. JAS. T. BUSKIRK, ET AL.

[Abstract Kentucky Law Reporter, Vol. 5—605.]

**Equity.**

> Where the real estate of partners is held in the name of one of the partners and is sold by the sheriff on a creditor's execution against the record holder of title, and the partner who lives near and knows of such sale and also knows of the fact that the record holder has borrowed money on such title for his individual use, the partner

who does not hold the title has no equity in such property which is superior to that of those holding liens on such property.

### Sheriff's Bid at Judicial Sale.

While a sheriff can not legally bid in property sold by him as sheriff, it is not a violation of the law for him to bid for a litigant who has written to him a bid for the amount of such litigant's claim. Under such facts the bid is made by the party and not by the sheriff.

APPEAL FROM GRANT CIRCUIT COURT.

January 19, 1884.

OPINION BY JUDGE PRYOR:

The indebtedness of Buskirk to Osborn was reduced to a judgment in the Grant Circuit Court in November, 1873; and on the 11th day of May, 1874, the house and lot were sold under an execution issued on the judgment for the debt, interest and cost, amounting to $75.90, and purchased by the attorney for the plaintiff in the execution. The attorney after this became the owner of the debt and transferred it to Burgess on the bid, the latter paying its full value. Buskirk failed to redeem the propery and a deed was made by the sheriff to Burgess in December, 1876, and recorded in the clerk's office of the Grant County Court, the county in which the property is situated.

After the execution of this conveyance various executions issued in favor of the appellants or some of them against Burgess on judgments against him obtained in the Grant and Kenton Circuit Courts. These executions issued in the year 1877 and were levied on the house and lot conveyed by the sheriff to Burgess by reason of the Osborn execution. Some time after the executions were issued and levied, Burgess, being indebted to Hanks in about the sum of $6,000, executed to him a mortgage on the house and lot, together with other property to secure its payment. The property was sold under the executions against Burgess and purchased by the plaintiffs, and when this was done Hanks filed his petition to foreclose the mortgage making the execution plaintiffs defendants. A few days before this was done, viz., April 9, 1878, the appellee, Buskirk, filed his petition in the same court against Hanks and all the execution purchasers, in which he sought to set aside the execution sales and the mortgage and also the conveyance made to Burgess by the

sheriff. He claims that in the year 1872 or 1873 he formed a partnership with Burgess by which the two were to build on this lot that was sold, and divide the profits and rents, and at the end of five years the entire property was to be restored to him as the absolute owner, that Burgess and himself contributed about equally to the erection of the buildings, the same costing in all $1,600; that Burgess took possession of the land and was in possession at the time of bringing the action in April, 1878. He alleges that Burgess was to redeem the property under the Osborn purchase out of an indebtedness by Burgess to him, and he supposed he had done so until a short time before he instituted his action; that Burgess obtained the deed by fraud; that the appellants, the execution purchasers, and the mortgagee, Hanks, all had notice of his claims; that the assignment by Osborn's attorney to Burgess was without authority. He asks that he be permitted to redeem the lot and that the sales and mortgage be set aside. The defendants filed an answer denying generally and specifically the statements in the petition, and upon the hearing a judgment was rendered for Buskirk, of which appellants complain.

The principal witness for the appellee, Buskirk, is Burgess, who deposes to the agreement as to the buildings, his promise to redeem the property from Osborn, his indebtedness to Buskirk, and that he notified the execution plaintiffs or their attorney and the mortgagee, Hanks, when the executions were levied and the mortgage given, and that the property was Buskirk's and not his. It appears from the testimony that Burgess must have had considerable property, and this is not only inferred from the nature of his business transactions, but from the property embraced in the mortgage to Hanks. What Buskirk was worth does not appear, but so far as this record shows he owned nothing outside of the lot and buildings he now claims. He was unable to pay the Osborn execution, amounting to less than $100, and permitted this property sold, and seems never to have inquired after its redemption or to have had a settlement with Burgess, who admits that from the rents of the property he had collected about one-half of the original cost. From the time the property was built to the institution of his action, the sum of $50 is all that he and Burgess state was paid him. He has not only permitted Burgess to become largely indebted to him in the meantime, but permitted the property to be sold four years be-

fore he brought this action, a deed recorded to Burgess, the property sold as the property of Burgess under these executions, and a mortgage to Hanks, too, all matters of record, without any notice on his part to creditors or others of the existence of his claim. His relief is sought on the ground that he was ignorant of the transactions, and had removed to Pendleton county, a distance of twelve or thirteen miles from where the property was located. When he moved to Pendleton does not clearly appear, certainly not until after the sale under the Osborn execution; but if he had moved before, it is shown by Glascock that he was frequently in the town and in the building, the former having rented it as a business house. From 1874 he makes no inquiry as to the condition of the property, or even a settlement with his partner, who had acquired the absolute title and was executing leases and mortgages in his own name, some of which were matters of record and the others known by those familiar with what transpired in the town.

The creditors of Burgess had the right to suppose that he was the real owner. He had his deed of record. He had rented the property to others in his own name, had surrendered it to the sheriff for sale under the executions, stating that his title was good, and when all this had been done, stultified himself by stating that he gave the appellants notice of Buskirk's equity, and was practicing not only a fraud on his creditors, but had defrauded his partner from the beginning. Nor is the corroboration of any fact sworn to by Burgess in the case sufficient to overthrow the testimony of Hanks, Defarndte, Collins, etc., in regard to notice. The title was investigated by attorneys, and it is unreasonable to suppose that the execution plaintiffs or Hanks could have acted as they did if informed by Burgess that Buskirk was the owner. Powell and Thompson state that Burgess told Hanks it belonged to Buskirk, when Collins says they inquired of Burgess as to his title and he went with them to the office to show his deed, and Collins and Hanks say that no mention was made of Buskirk by Burgess. The sheriff says that Burgess surrendered the property to him and told him to levy upon it, that he asked him about the title and he said it was good. Defarndte states that he wrote the deed for Burgess from the sheriff and was requested by Burgess to be careful, that he intended to keep the property and wanted a perfect title. We think it is manifest that these appellants were without notice of ap-

pellee's claim, and that Burgess could not have been so unfaithful to his partner as to divest him of title, and then proceed to mortgage it for his own debts, or surrender it for that purpose, to be sold by creditors, unless the appellee had surrendered his claim or in some manner recognized the right of Burgess to use the property in that way.

This claim was never asserted until the bankruptcy of Burgess. When his pecuniary condition was such as to border on insolvency the appellee for the first time since the erection of the building discovers the treachery of Burgess and realizes the fact that no settlement had ever been made with reference to the rents and profits of the partnership estate. It does not appear that the appellee was in a condition to indulge Burgess, but on the contrary that Burgess was the man of means or of at least business credit, and why all this claim of ownership asserted by Burgess as well as by his creditors to this property should have been unknown to appellee from 1874 until 1878 is not only mysterious but from the facts of this record is incredible. He must have known it. The public manner in which the property was exposed to sale, the recording of the deed and mortgage, and the entire action of Burgess indicates clearly that he was the owner and not appellee. Glascock says that he rented the property in 1876 and that, while he was occupying it, the appellee was frequently in Williamstown and at the store. It is certainly remarkable that he never heard of all these transactions until his partner had become bankrupt and his creditors were suing the estate.

He comes into a court of equity seeking to enforce an alleged equity against those who had acquired equities as purchasers, and whether for debts originating before or after the execution of the sheriff's deed to Burgess is immaterial, as in our opinion the appellee has no equity against these creditors. He may have an equity as against Burgess by reason of the admission by Burgess that he practiced a fraud upon him, but this admission, made only to defeat these claims, as we feel compelled to decide, can have no weight against those whose honesty and fair dealings leave no doubt in the mind of the chancellor as to the purity of the equity they are asserting.

Nor was the sale by the sheriff under the execution in favor of Mullins and Crigler void because of the manner in which it was

sold. It is alleged that the sheriff was the bidder and that the sale for that reason is void. The Gen. Stat. 1883, ch. 38, art. 15, § 2, provides: "No officer shall, directly or indirectly, bid for or buy any property which may be sold under an execution by his deputy or principal, or by his codeputy. 1. The right of property so sold and purchased by any such officer, or by another to his use, shall not thereby be changed. 2. Any deed or bill of sale made for property so sold shall be void." In the case of *Dixon v. Sharp*, 1 A. K. Marsh. (Ky.) 211, this court held that a sheriff could not bid for a purchaser at a sale of land made by him. In this case the execution plaintiffs, Mullins and Crigler, were not present at the sale and wrote to the sheriff as follows: "Mullins & Crigler bid the debt, interest and costs of the execution you have levied on the property of George Burgess. If anybody will bid the same don't cry our bid." Signed "Mullins & Crigler." The bid was made by the parties and not by the sheriff, and the crying of the bid as authorized was neither a violation of the letter nor spirit of the statute.

The Bentley execution was owned by Defarndte, the attorney, when he made the transfer to Burgess, and we perceive no reason as between the execution creditors and Buskirk of determining the priority or nature of the several liens as the latter has no interest in the controversy.

The judgment below is *reversed* and cause remanded with directions to dismiss the petition of the appellee, Buskirk, and for proceedings consistent with this opinion.

*Collins & Fenley, for appellants.*

*Geo. C. Drane, E. H. Smith, for appellees.*

[Cited, *Brannin v. Broadus,* 94 Ky. 33, 14 Ky. L. 726, 21 S. W. 344.]